OPINION
By LEACH, J.
This is an action by the owners of certain lots in Kenmore Park Addition seeking to enjoin the defendant, which is the owner of other lots in said Addition, from violating certain building restrictions claimed to be applicable to said defendant’s lots.
On July 31, 1925, The Willard Company, a corporation, deeded to The Citizens Trust & Savings Bank, as Trustee, which Trustee later became known as The First Citizens Trust Company, and still later as The Ohio National Bank of Columbus, certain real estate in trust, “to pay the taxes, assessments, charges and liens thereon; to subdivide said real estate into-lots; to make and execute a plat thereof and to dedicate to public use streets and alleys therein; to record said plat and to make and execute deeds upon the sale of any or all of said lots; to sue for, collect and receive the purchase price and by itself or its agents to give receipts and acquittances therefor; to accept and receive notes and mortgages for the purchase price of said lots and to disburse the moneys and proceeds received from the sale of said lots (all in accordance with an agreement entered into of even date herewith by the Willard Company).” * * * This deed was properly filed for record, but there is no- evidence that the agreement referred to in the above parenthesis was recorded, nor is it in evidence.
Said real estate was platted by The Citizens Trust & Savings Bank, Trustee, and said plat was filed for record on the 22nd day of October, 1925. The avenues, alleys, roads, streets and parks shown on the plat were thereby specifically dedicated to public use, and said plat was properly acknowledged and recorded, it first having been approved and accepted by ordinance of the Council of the City of Columbus. Said plat makes no reference to restrictions, upon any of said lots. !
Apparently The Willard Realty Company was the sales agency for said lots, and said company issued certain advertising matter at that time containing general references to restrictions in the Addition, and referring to it as a restricted residence community. Articles in the real estate section of local papers purporting to be news items, contain such matter as “Building restrictions assuring the erection of only homes of highest character are placed on every lot in the addition and will be enforced to- the letter. And, although a wide range of house costs will be permitted, a unique form of architectural su-1' pervision will insure a worthy and harmonious development.” The Willard Company or The Willard Realty Company also published advertisements advertising the lots for sale containing general reference to the restrictions. These advertisements appeared in 1925 and ’26.
The Addition contained a large number of -lots and many of them were sold, some upon land contract *572 and some in which deed was given. All of said land contracts and all of said deeds so given by the Trustee contained identical matter relative to restrictions. In certain groups of lots it was provided that no building except one single dwelling house costing not less than $4500.00 shall be erected, on other lots the minimum building cost was placed at $5,000.00, on others at $5500.00, and on still others at $6500.00, and still others at $7500.00.
Something in the neighborhood of 122 houses have been built in the Addition on lots, the deeds to which each and every one contained the restrictions. The Addition contained in the neighborhood of 400 lots. Each of the deeds so issued by the Trustee contained a provision, among other things, that as a part of the consideration for said conveyance and for the mutual advantage of present and future owners of lots in said Addition, the grantees agreed to such restrictions; that such restrictions shall be held and considered as covenants and not as conditions, and shall run with the land, and shall be made a part of and attached to all deeds and conveyances, instruments, leases, transfers and assignments affecting said premises. “Said premises” refers to the lots so conveyed only, there being no language binding grantor to make similar deeds when it sold other lots.
The taxes not being paid on a large group of unsold lots in the Addition, the Prosecuting Attorney brought an action to foreclose said lots for said unpaid taxes, and they were ordered sold, properly advertised, and William Wasserstrom as Trustee for a corporation to be formed, and which was subsequently formed, as the defendant corporation, purchased in 1942 at Sheriff’s sale about 51 of said lots, all of them being generally in the northwesterly portion of the Addition. The Sheriff’s deed to Wassex’strom was silent as to restrictions, and the deed from Wasserstrom to the defendant corporation was likewise silent as to restrictions.
The defendant corporation has projected the construction of 51 so-called defense homes on the lots so purchased by it, and has arranged loans for such construction with The Union Central Life Insurance Company, and has further arranged and obtained commitments from EHA guaranteeing 90% of said loans, and has obtained building permits from the City Building Division for the construction of a number of said homes, and has begun the construction on some six or eight of them.
The legal title to all of said lots so sold to Wasserstrom, and in turn to the defendant corporation, had remained continuously in the name of the Trustee, never having been sold to anyone, so there was nothing in the chain of title to any of said lots making any reference to said restrictions with the following exception: On October 30, 1926, the Trustee conveyed to Burdette A. Williams lots 11 to 15, inclusive, of block 12, and lots 2 to 6, inclusive, of block 13 in said Addition. The uniform matter printed in all of the deeds relative to restrictions was contained in said deed to Williams. On October 19, 1928, Walter R. Snider, as Receiver for Burdette A. Williams, conveyed to the Trustee lots 3 and 5 of block 13 and lots 11, 12, 13, 14 and 16 of block 12. Lots, 11, 12 and 13 of block 12 were among the lots purchased by Wasserstrom at Sheriff’s sale, and these three lots are therefore the only lots purchased by Wasserstrom, or by the defendant, containing any reference to the re *573 strictions in the chain of title. In other words, there is nothing in the chain of title with reference to all of the lots except the three just mentioned to which any reference to the restriction is made anywhere in the chain of title.
It is contended by the defendant that inasmuch as said lots were sold for the collection of delinquent taxes and assessments, that by reason thereof, it took title free of any restrictions applicable to said lots, if any there had theretofore been.
With this contention the Court is unable to agree, but the Court rather concurs with the opinion of the Attorney General, dated May 10, 1939, published in Volume 1 of Opinions of the Attorney General, page 717, where he field:
“Where building restrictions are placed on the lots in an allotment or district and are enforcible by the person originally restricting the use of such property or by the assigns of such person, or by the owners of other properties of the •allotment or district, such rights of enforcement are not lost nor abated by a tax lien foreclosure and sale of such lot.”
The Attorney General cites a number of authorities for his conclusion, among them 3, Cooley on Taxation, Fourth Edition, page 2944, Section 1494; Lesley v Morris, 9 Phila. (Pa.) 110; Northwestern Improvement Company v Lowry, 66 P. (2d) 792, this last case being a Montana case, where the court said:
“A tax sale, though operating to give the purchaser a title free of encumbrances, does not divest the premises of a negative easement to which they are subject.”
Two cases recently decided by the Supreme Court and both reported in 139 Oh St are cited by both plaintiff and defendant.
In the case of Dubin v Greenwood, reported in 139 Oh St 546, it was held:
“Where real estate has been forfeited to the state for nonpayment of taxes and assessments in accordance with applicable statutes, a valid sale and conveyance of such real estate by a county auditor extinguishes all- previous titles thereto and invests purchaser with a new and perfect title, free from prior liens and encumbrances.”
In Ross v Franko, et al, 139 Oh St 395, it was held:
“A private recorded easement was not extinguished when the burdened land was duly forfeited and sold by the State for delinquent taxes.”
In this case the Court makes a distinction between a lien and an easement, pointing out that a lien is a charge upon property to secure the performance of an obligation, such as the payment of a debt, while an easement is a right of an owner of land to use that of another for a specific purpose, and the Court approves the statement of Cooley as contained in 3, Cooley on Taxation, Fourth Edition, Section 1494, as follows:
“Ordinarily, a tax sale does not divest easements charged on the property sold. Thus, private easements of light, air and access of adjoining owners over the land sold are not extinguished py the tax sale.” ■
*574 It is apparent from a reading of the two cases that the Dubin case dealt with liens, while the Ross case dealt with easements.
As pointed out in the Attorney General’s opinion, supra, restrictive covenants as to use of land or the location or character of buildings or other structures thereon create easements. Such easements are frequently defined as negative easements. See 14 Am. Jur. 608, Section 193.
And a negative easement has been defined in 15 O. Jur., p. 20, §10, as “One which curtails the owner of the servient tenement in the exercise of some of his rights in respect of his estate, in favor of the owner of the dominant tenements.”
Defendant also contends that it is the owner of the legal title to a majority of all of the land on both sides of the streets where said lots are located, and that by reason of the terms and provisions of said alleged conditions and restrictions the same are modified, altered, ineffective and waived by reason thereof.
The terms and conditions so referred to specifically as quoted from said uniform deed provisions are as follows:
“Also as part of the consideration for this conveyance and for the mutual advantage of the present and future owners of the lots in said addition, the grantee herein agrees to the following -auditions, restrictions and reservations affecting said premises, and consents that the grantor may change or cancel any of said conditions or restrictions whenever in its judgment it may be desirable to make the same correspond with the provisions of any present or future ordinance of the City of Columbus affecting said premises, or when there is a decided change m the cost of construction, or when the development or lack of development of said premises or adjoining or adjacent property, makes a change or cancellation necessary or advisable. Said conditions and restrictions shall be held and considered as covenants, and not as conditions hereof, and shall run. with the land, and shall bmd grantee until January 1, 1950, in. any event, and continuously thereafter, unless and until any proposed change shall have been approved in writing by the then owners of the legal title to all of the land on both sides of the street within the block in which is located the property, the use of which is sought to be altered by said proposed change, and shall be made a part of and attached to all deeds and conveyances, instruments, leases, transfers and assignments affecting said premises, which conditions and restrictions are as follows : ”
With reference to this provision, it will be noted that it is the grant- or who may under certain conditions change or cancel said restrictions. There is no evidence that the grantor has done so. And without consideration of the question as to whether the grantor could make such cancellation or change before January 1, 1950, in any event, it is specifically stated that such proposed change requires the approval “in writing by the then owners of the legal title to all of the land on both sides of the street within the block in which is located the property.” The defendant does not own all of the land on both sides of any of the streets within any block in question.
This contention on behalf of the defendant is also claimed to be supported by paragraph 31 of the *575 language contained in the uniform conditions:
“31. It being understood, however, that the rights of The Willard Company shall apply with equal force and effect to its successors and assigns, but in the event the ownership and control of their rights pass from the hands of The Willard Company interests, either by reason of the appointment of a receiver, assignment for the benefit of creditors, bankruptcy, by sale under legal process of any kind, by the transfer of ownership of a majority stock to other interests, or otherwise, the provision for consents by The Willard Company in this deed provided for shall be deemed to be sufficiently obtained. if obtained in writing from a majority of the owners of the legal title to all of the land on both sides of the streets within the block in which is located the property.”
By a reading of the entire conditions as contained m said deed, it is evident that the “provisions for consents by The Willard Company” refers not to consents for making change in the restrictions as referred to in the language heretofore quoted, but to consents in other connections. Moreover, while the defendant does own a majority of the lots on both sides of the street within the block in ■which is located its lots, with the exception of the lots in block 20, it is to be noted that even if said paragraph 31 had any application here, the language requires not the consent in writing of the owners of a majority of the lots, but does require the consent in writing from a majority of the owners of the legal title to all of the land on both sides of the street. The defendant corporation is a single owner of these lots, and on none of the streets in question is said single owner a majority of the owners involved.
Defendant also defends on the ground that it has and will comply with the restrictions claimed. On the basis of the estimated cost as given by the defendant’s own representatives in their testimony in court, as well as the applications made to the Building Department of the city for permits to build, this contention can not be sustained.
Defendant also contends that plaintiffs are estopped to enforce said alleged restrictions because of their conduct in remaining silent, their inaction and their conduct in permitting defendant to proceed with large commitments and investments in said lots and improvements before the same were instituted. The court is not of opinion that this contention could have any possible merit except as to those few lots where construction work was under way at the time of the granting of the temporary injunction. Defendant's Superintendent of Construction states that actual construction work began about September 4th, and a temporary injunction was granted on September 16th. At that time excavations for basements had been completed on__lots, cement foundations constructed for__lots and the framework of one house had been constructed up to the roof line. Of course, substantial commitments had been made on the whole project, involving the construction of 51 houses. A representative of the company. Mark D. Feinknopf, testified that the company had invested in the project, exclusive of cost of lots, approximately $7500.00, and obligated themselves for very much more in order to get materials under the priority system now in effect. The Court is of opinion that *576 in view of considerations later to be adverted to, that the element of claimed laches could have no proper bearing on lots on which construction had not yet begun, and in view of the considerations next referred to, it is immaterial as to the lots upon which construction has begun.
This brings us to the defense claimed by the answer that the defendant is not bound by any restrictions in said allotment because it had no notice thereof prior to the time of its purchase of said lots.
Some of the pertinent facts relative to notice have already been recited. There is no evidence whatever in the record that the defendant corporation or any of its officers or agents had any notice of the existence of the restrictions contained in any other deeds in the Addition prior to the purchase made by the defendant. There is no evidence in the record that the defendant or any of its officers or agents had any notice of the adoption of a general plan of restriction, or that they had any knowledge of any matter contained in any advertising, prospectus or newspaper article published or circulated back in 1925, ’26 or ’27. Certainly said newspaper advertisements were not and did not purport to be legal notices; nor in the absence of actual knowledge of such publications made sixteen years before the present purchase, can they be said to have any constructive notice by reason thereof, The general law relative to the subject matter has been definitely stated by our Supreme Court in Adams v Donovan, 97 Oh St, p. 84:
“Before such restrictions can be enforced against a purchaser whose deed does not contain such restrictions, it must clearly appear by the evidence, that there was such a general plan of uniform restrictions upon all the lots in the allotment; that the deeds for lots in the allotment uniformly contained such restrictions; and that the purchaser had knowledge of such general plan of uniform restrictions at the time he purchased his lot.”
It was admitted by Wasserstrom and Feinknopf, representatives of the defendant, that they had actual notice of the restrictions which' had been contained in these deeds on August 10, 1942, and a denial that they had any notice whatsoever prior to that date, and there is no evidence that they did have any actual knowledge prior to August 10th. This date, of course, is subsequent to the date of the acquisition of the property.
As was well Stated by the Su-preme Court of Ohio:
“If the plan had been noted on the recorded plat notice thereof would be imputed to each lot purchaser. It would be a part of his chain of title.”
Kiley v Hall, 96 Oh St 380.
*577 *576 Why the plan of restrictions was not noted on the plat which was recorded and made a part thereof by developers of the Addition does not appear. For the protection of all of the owners of this or like additions the statement just quoted from the Supreme Court might well be observed generally, but in this case it was not. If the evidence showed actual notice of any general plan — if there was a binding general plan — at or prior to the purchase by the defendant of the existence of such restrictions the same would have been sufficient. They are also bound to take notice of anything in their chain of title in so far as it affects the particular lots where anything appears in the chain of title- *577 relative to said lots. As to lots 11, 12 and 13 in block 12 the deed heretofore noted from The Citizens Trust & Savings Bank, Trustee, to Burdette A. Williams, containing the restrictions, is in the chain of title and constitutes, in the Court’s opinion, constructive notice to the present' defendants as to said three lots, but such recorded deed did not give the defendant purchaser constructive notice of the existence of restrictions on other lots with respect to which there was nothing on record in the plat or the chain of title to any of said other lots making any reference to restrictions. If the defendant purchaser did not actually examine said deed to the three lots, which deed contained the restrictions, it, nevertheless, was chargeable with notice as heretofore stated as to said lots. But neither Wasserstrom nor the defendant was bound to examine the title to these three lots containing such restrictions in so far as its duty in examining the title to the other lots was concerned.
No rule of law has been cited, and the court knows of none, which requires a prospective purchaser of one piece of property to examine the title to another piece of property to see if there be anything therein which would affect the title to the property first mentioned. Of course, if such prospective purchaser should, Sn fact, examine the title to such ¡other property and should find therein something which would affect the title to the property first mentioned, then he would have actual notice thereof and be bound thereby, but such a state of facts is not in evidence here. The contrary is true. As we have before seen there was nothing in any individual deeds or contract binding the grantor to place similar restrictions on other lots to be sold, but even if there had been, there was no notice to defendant. Representatives of the defendant deny that they knew of the existence of the deed to Burdette A. Williams and had not seen it prior to the purchase of the lots at Sheriff’s sale. Whether they saw it or not, they were bound by its terms in so far as the 'lots covered by said deed was concerned, but not as to other lots. The purchaser would be in the same position as any other purchaser relative to said lots, other than lots 11, 12 and 13.
The second syllabus of the case of Boggs v Varner, 6 Watts & Sergeant’s Reports, 469 (Supreme Court of Pennsylvania) is as follows:
“A recital in a deed is evidence of notice to the purchaser of the fact recited, and he will be affected by it so far as it concerns the title to the land purchased;. but it will not affect him with notice in regard to the title of any other land than that which is conveyed by it.”
It is most unfortunate that the home owners in this Addition, who bought lots therein containing the restrictions and who built their homes thereon assuming that all other lots in the Addition were to be similarly restricted, should now, after many years, be met with the discovery that through, failure to place on record anything that would operate as notice to subsequent purchasers of other lots, their assumption as to such lots should be found to be incorrect. But the Court must take the facts as they appear from the records and the evidence. A chain is only as strong as its weakest link. In this case there is one entire link of the chain entirely missing. • • • -
*578 It follows from the above discussion, that the temporary injunction should be made permanent as to lots 11, 12 and 13 of block 12, and dissolved as to all the other lots in question, and it is so ordered.