**KLINE et, Plaintiffs, v. COLBERT et, Defendants.**

Common Pleas Court, Montgomery County.

No. 100,357. Decided September 16, 1947.

Landis, Ferguson, Bieser & Greer, (Rowan A. Greer), Dayton, for plaintiffs.

John A. Benjamin, Dayton, for defendants.

## OPINION

By CRAWFORD, J.

Plaintiffs, as individual home owners in the College Hill Plat, and as members of The College Hill Association which

includes many other home owners in the same plat, on behalf of themselves, their fellow members and others similarly situated, seek to enjoin the construction by the defendants of a prefabricated steel and porcelain Lustron house on Lot 230 in such plat, because of the failure of the defendants, Rita Colbert, owner, and Charles Colbert, her husband, to obtain the approval of their building plans and specifications from The College Hill Improvement Company, developer of the plat, or from its successors or assigns, in accordance with a building restriction appearing in her chain of title.

Passing for the moment the multitude of other questions raised, let us examine all the restrictions contained in the deeds, pertaining to this plat. A brief summary of these is somewhat as follows: all lots in the sub-division are to be used exclusively for private residence purposes (except part reserved for community enterprises); only one house to accommodate not more than one family shall be erected on each lot in the particular section involved; only one house to accommodate not more than two families shall be erected in certain other sections; minimum costs are provided; set-back distances from streets and sides of lots are specified; members and descendants of the Ethiopian race are excluded; manufacture and sale of intoxicants are banned; detached garages are forbidden on corner lots; and, finally, there is the restriction now challenged which reads substantially as follows: "The grantees hereby agree for themselves, their heirs and assigns, not to erect any structure on the herein described premises, unless the plans and specifications thereof shall have the written approval of The College Hill Improvement Company of Dayton, Ohio, its successors or assigns."

On the basis of this last restriction approval of defendants' plans and specifications has been withheld for the reason that the proposed structure is found not to be in harmony or in keeping with the existing residences and development surrounding the lot in question.

We can perceive no fundamental distinction between this situation and that in the case of **Exchange Realty Company v. Bird, 16 Abs 391,** wherein the Court of Appeals for the Ninth District construed an almost identical covenant as authorizing the approving authority to determine only whether the proposed construction complied with the other specific restrictions established for the plat. It was held that this did not confer any power to prescribe the materials to be used in the roof.

That court says (page 394):

"While such a restrictive covenant in a deed requiring the submission to and approval by the grantor of all plans for the erection of a house is held to be a valid and enforceable covenant * * * — it will be noted that such a covenant is always used in connection with some general plan or scheme or some other designated or stated restriction within which such approval may operate, or that the covenant regulates the scope of the approval * * *."

While the language in the covenant to the effect that "no such house" should be erected without approval was quoted by the court is support of the conclusion that the other restrictions constituted the only test, yet it is obvious that the decision did not rest alone upon such wording. For the court continues with this comprehensive statement:

"We find no decision or text to the effect that a covenant requiring the submission to and approval of plans by the grantor, standing alone, without any other restriction, is enforceable."

The court goes on to say that restrictive covenants must be interpreted by gathering the intention of the parties from the entire context, that where the meaning is doubtful, consideration will be given to all the surrounding circumstances at the time the contract was executed, "but the restrictions will not be extended by implication," and must be strictly construed against the person seeking to enforce them.

Plaintiffs argue that the court was impelled to its conclusion because the specific covenants were so numerous and detailed as to require an examining procedure. Upon careful reading of the decision, we must decline to accept this argument. The degree of detail provided in the other restrictions may strengthen but does not create the principle stated. Furthermore, as compared with ten specific restrictions there, we have as many as seven or eight here.

That case, decided in 1933, appearing never to have been challenged, remains the law of Ohio. It was followed, correctly it seems, in the case of **Finlaw v. Jacobs, 30 O. O. 7.** There Judge Schwab of the Hamilton County Court of Common Pleas likewise held that the requirement that plans be submitted and approval obtained could not be used to enlarge other restrictions.

In our present case, also, the purpose in requiring submission and approval of plans is not explained, nor is there any definition of the standards to be applied or the scope of inquiry to be made, unless we gather them from the other specific restrictions.

Hence, plaintiffs' contention that the standard to be applied is whether the proposed structure is harmonious and in keeping with the existing structures and surrounding conditions requires the extension of the restriction by implication.

Plaintiffs cite cases from other states to show that such restrictions have been upheld.

Two of these cases are definitely distinguishable in that the restrictions quite fully and explicitly authorize the grantor to consider a proposed structure in the light of its suitability to its surroundings. The language used in the restrictions is almost identical in these two cases, namely, Jones v. Northwest Real Estate Company, 131 Atl. (Md.) 446 (1925) and Parsons v. Duryea, 158 N. E. (Mass.) 761 (1927). In the Jones case it is expressed as follows:

"* * * the party of the first part shall have the right to refuse to approve any such plans or specifications or grading plan, which are not suitable or desirable, in its opinion, for aesthetic or other reasons; and in so passing upon such plans, specifications, and grading plans, it shall have the right to take into consideration the use and suitability of the proposed building or structure and of the materials (of) which it is to be built, to the site upon which it is proposed to erect the same, the harmony thereof, with the surroundings, and the effect of the building or other structures as planned on the outlook from the adjacent neighboring property."

In the Jones case the court expressed doubt whether plans could be rejected on purely aesthetic grounds, but held that under the restriction quoted above it was proper to reject them if "out of keeping with the surrounding structures and with the general appearance of buildings in Ashburton."

These two cases are clearly distinguishable because of the clarity of the test and considerations to be applied.

The case of Peabody Heights Company v. Willson, 82 Md. 186 (1895), also cited, holds that a covenant to submit and obtain approval of "design" is enforceable, while denying specific performance of a contract for sale of real estate subject to such restriction.

The other case cited, Harmon v. Burrow, 106 Atl. 310, 263 Pa. 188 (1919), upholds and enforces a covenant providing simply for submission and approval of plans. It is somewhat difficult to perceive the practical effect of the decision. There is a suggestion that the grantor is permitted under this restriction to withhold approval of a duplex, a type of house

not precisely forbidden by any other restriction. If so, the restriction is extended by implication.

However contrary these latter two cases may be to that of Exchange Realty Company v. Bird, supra, they are neither sufficiently recent nor convincing to offset the compelling force of the above decisions in our own state.

We pass next to the question whether, even if the expressed restriction is inadequate and therefore unenforceable as framed, there was such a general scheme or plan of which the defendants had or are charged with notice, (13 O. Jur. 985, Deeds, Paragraph 169) as would bind them to obtain an approval, which might be granted or withheld upon considerations of harmony with surroundings.

It appears to be agreed that there is now a total of 635 lots in the plat, which was originally established by The College Hill Improvement Company on May 10, 1924, revised in 1925, and again in 1928; that there are no restrictions on the recorded plat, but that by deed all of the other restrictions above mentioned were established.

It appears from the evidence that an undetermined number of lots, designated as "a few," (defendants say 17), were originally sold without the restriction in question; that in 1927, pursuant to an agreement or understanding between the company and individual lot owners, deeds were thereafter issued to purchasers containing this restriction, and prospective purchasers were advised of same; that ultimately it was contained in deeds to 141 lots either sold or retained by the developer, including Lot No. 230; that plans and specifications were accordingly presented to The College Hill Improvement Company by individual purchasers and owners of such lots; that Colonel John G. Griggs, secretary of the company, passed upon the same, and, in so doing took into consideration whether or not a proposed structure was suitable to its environment, and was of comparable quality and compatible style in conformity with its surroundings, although no uniform style of architecture was sought or required; that subsequently The College Hill Improvement Company went into receivership, holding title to 423 lots on which the restriction was never placed; and that there were at the time some additional lots retained by the Gardner Company, also managed by Colonel Griggs, upon which the restriction was apparently never placed.

Subsequent to the appointment of a receiver, there was apparently little construction upon the plat until after large numbers of the lots were sold on tax foreclosure sale. Several houses (perhaps 25) were then built, about 1947; and a suit

for declaratory judgment was begun in this court on October 9, 1947, being Case No. 98227.

In that suit certain lot owners seek to have defined the rights of all parties under the restrictive covenants. The court therein appointed Mr. Rollin L. Rosser, an architect of recognized standing and ability, to pass upon plans. Eight sets of plans for eight lots were submitted. Considerable confusion has arisen as to the precise duties of Mr. Rosser, the standards he should apply and the questions he should determine, all resulting from uncertainty as to the force and meaning of the covenant now before us.

The defendants submitted their plans to Mr. Rosser, who rejected them as inharmonious and incompatible with their surroundings. Further hearing on these plans was begun before Judge Don R. Thomas of this court, but no approval was given. Thereafter the defendant, Rita Colbert, obtained her deed, but has delayed construction awaiting a decision in the present case.

Before proceeding to a consideration whether, as defendants contend, plaintiffs have been guilty of laches, or have abandoned any general scheme or plan, or whether the nature of the plat has so substantially changed as to render the restriction no longer enforceable, let us first consider whether there was a general scheme or plan with respect to approval actually in existence prior to the receivership.

Apparently the agreed practice was followed of submitting plans and specifications to Colonel Griggs for approval. He says he did not seek uniformity of architecture, but harmony and suitability of design to surroundings.

What then was the general scheme or plan? Simply Colonel Griggs's taste and judgment in a multitude of individual cases. However excellent his decisions may have been, they could hardly create a demonstrable general plan. And such result could scarcely be attained unless he were actually to design or prescribe the design for each house. The only thing that was concretely uniform was the practice of submission and approval of plans as specified in the deeds and agreement.

We are therefore left only with the requirement of submission and approval, which has been declared too vague and indefinite to be enforced. Quoting again from Exchange Realty Company v. Bird, supra, (page 394):

"If this language were the only restriction in the deed, it surely would be entirely too vague and indefinite to be enforceable in a court of equity, and would be totally ineffective, as standing alone it would be devoid of any general

plan or scheme, would be unlimited in its scope, and would leave the purchaser subject to the mere whim of the seller and permit the seller to require a structure of any kind or value to be erected on any lot, and could result in a mere shack being built on one lot, and a palatial dwelling on an adjoining lot; or the seller might require any other kind of building, business block or factory to be built on any particular lot. The purchaser would thus have nothing of value; and such restrictions would therefore seem to be against public policy and be void.

"It is thus evident, to give meaning and effect to such language, it must be used in connection with and confined within other restrictions and limitations and construed with them as a whole."

Hence, in the light of the present authority in Ohio, there is no enforceable covenant established, either by the language of the deeds in defendants' chain of title or by practice in the plat, requiring submission and approval of plans for determination or anything other than compliance with the specific restrictions.

Therefore, we do not reach the questions of laches, waiver, or substantial change in the nature of the plat.

In justice to Mr. Rollin L. Rosser, architect, it must be said that he has earned the commendation and gratitude of the court for having performed a difficult task under trying circumstances with the high integrity and proven ability for which he is known and respected. It is unfortunate that he should have been subjected to the trivial annoyances which are so often engendered in the heat of contest.

The comparative merits of Lustron and conventional housing are not before us. But the obvious fact that Lustron is a new and distinct product, its sponsors would probably be the first to proclaim. In promoting its acceptance, especially where it is vigorously opposed, they might care to ponder the ancient adage which warns against pouring new wine into old bottles, which is often disastrous alike to the vessel and to its contents.

And these young and apparently amiable defendants are reminded that a privilege so eagerly sought today may turn to bitterness tomorrow; that while occupying a house they must also dwell in a neighborhood.

These are but suggestions, intended to be helpful, which equity cannot enforce. They lie beyond the power of the court, in the realm of conscience.

The prayer of the petition must be denied.